846 F.Supp. 768 (1994)
UNITED STATES of America, Plaintiff,
v.
Edward James CLARY, Defendant.
No. 89-167-CR (4).
United States District Court, E.D. Missouri, E.D.
February 11, 1994.
Findings and Conclusion of Law Addendum to Memorandum Re: Imposition of Sentence February 23, 1994.
*769 Richard Poehling, Dan Muehlmann, Asst. U.S. Attys., St. Louis, MO, for plaintiff.
Andrea Smith, Asst. Federal Public Defender, East St. Louis, IL, for defendant.

FINDINGS AND CONCLUSIONS OF LAW
CAHILL, District Judge.
Defendant Edward Clary was arrested for possession with intent to distribute 67.76 *770 grams of cocaine base. Clary pled guilty to possession with intent to distribute cocaine base ("crack cocaine"), pursuant to 21 U.S.C. § 841(b)(1)(A)(iii) (hereinafter referred to as the "crack statute"), punishable by a mandatory minimum sentence of 10 years imprisonment. Prior to sentencing, Clary, a black male, filed a motion challenging the constitutionality of the crack statute and contended, inter alia, that the sentence enhancement provisions contained in it and United States Sentencing Guidelines (U.S.S.G.) § 2D1.1 violated his equal protection rights guaranteed by the Fifth Amendment.
The Court scheduled this case for hearing on the motion for a downward departure and the motion challenging the constitutionality of the statute. After extended hearings the Court took this matter under advisement and gave it detailed and exhaustive consideration. Upon evaluating the evidence and legal arguments, the Court issues this memorandum.
Specifically, defendant Clary asserts that the penalty differential of the "100 to 1" ratio of cocaine to cocaine base[1] contained in both the crack statute and the United States Sentencing Guidelines[2] has a disproportionate impact on blacks because blacks are more likely to possess cocaine base than whites who are more likely to possess cocaine powder. Therefore, defendant's argument continues, providing longer sentences for possession of cocaine base than for the identical amount of cocaine powder treats a similarly situated defendant in a dissimilar manner, which violates his right to equal protection under the law.

THE PROBLEM BEFORE THE COURT
Before this Court are two different sentencing provisions contained within the same statute for possession and distribution of different forms of the same drug. The difference  the key difference  is that possession and distribution of 50 grams of crack cocaine carries the same mandatory minimum sentence of 10 years imprisonment as possession and distribution of 5000 grams of powder cocaine. Both provisions punish the same drug, but penalize crack cocaine 100 times more than powder cocaine!
Congress tells us that the rationale for this sentencing dichotomy which produces harsher punishment for involvement with crack cocaine is because it is so much more dangerous than powder cocaine. As "proof," Congress relied upon endless media accounts of crack's increased threat to society. While Congress may have had well-intentioned concerns, the Court is equally aware that this one provision, the crack statute, has been directly responsible for incarcerating nearly an entire generation of young black American men for very long periods, usually during the most productive time of their lives. Inasmuch as crack and powder cocaine are really the same drug (powder cocaine is "cooked" with baking soda for about a minute to make crack), it appears likely that race rather than conduct was the determining factor.
Although both statutory provisions purport to punish criminal activity for both crack and powder cocaine, the blacks using crack are punished with much longer sentences than whites using the same amount of powder cocaine. This disparity is so significantly disproportional that it shocks the conscience of the Court and invokes examination.
The Eighth Circuit Court of Appeals has rejected numerous constitutional challenges to the crack statute and the United States *771 Sentencing Guidelines.[3] However, the Eighth Circuit acknowledged the "extraordinary disparity in punishment between possession of cocaine powder and cocaine base." United States v. Marshall, 998 F.2d 634 (8th Cir.1993).
"With so much at stake, however, in this and other cases, we are reluctant to say that full exploration of the issues is unwarranted ... in connection with crack cocaine punishments, which continue to perplex many sentencing judges. We do not invite mere repetition of prior rejected arguments, without new facts or legal analysis." Id. at 635 fn. 2.
This Court accepts the Eighth Circuit's invitation to present a novel legal analysis of the adverse disparate impact on blacks resulting from the imposition of 21 U.S.C. § 841(b)(1)(A)(iii). Here is the Court's analysis.

CRIME AND THE LEGISLATIVE RESPONSE
Crime!! The very word connotes fear and panic, resulting in a frenzied attempt to control and curtail criminal actions in today's violence-soaked world. Never before have Americans cringed at the thought of becoming victims of random, irrational assaults; never before has the fear and frustration of average citizens grown to such a level that a "lynch mob mentality" becomes the common emotional reaction to crime.
Today there are so many senseless crimes whose gory details are displayed in living color on living room TVs in America that people, inured to the bloodshed, simply retreat in horror from the senseless details. Crime has always been an unpleasant but ever present segment of life in America, but never has it been so brutally and instantaneously reported in repetitive words and pictures from all segments of the media  print, audio, and video. So whether there is more violence, as most believe, or whether the ratio is about the same but appears greater because of the larger population and visual immediacy makes little difference. There is no doubt that the public's perception is so pronounced that the public is prepared  no, anxious  to pay any price to control crime even to the abandonment of traditional constitutional safeguards.
The media has for years kept up a drum beat of repetitious reporting of the most horrendous criminal actions, intruding upon the grief stricken victims, interrogating them while they are in shock and tears, further enraging the public against anyone even accused of a crime. The presumption of innocence is now a legal myth.
Of especial importance is the fact that crime is no longer segregated to the other side of town. People living in the "better parts" of the community are now subject to the random anger and uncontrolled hatred of psychopaths and weak, frustrated individuals unable to cope with the problems of life. *772 When one reads of the brutal murder of elderly persons in the bedrooms of their ransacked homes, of gangland style executions and drive-by shootings, and ravishment of innocent children of tender years, it is understandable that anxious citizens demand action. Legislators, feeling the heat of the public's anger, scramble to comply with the demands of raging infernos caused by the citizens' ire.
For the last few years there has been a feeding frenzy of responses by lawmakers of every stripe and political persuasion, so that both Congress and state legislators fill the hoppers with proposed bills designed to curtail crime (each one more restrictive or Draconian than those before) in the misguided hope of reducing crime, but in the certainty that, effective or not, it will gain votes.[4]
It is true we need the relief demanded by citizens. It is true that we need firm and stern punishment for many crimes, including life imprisonment in appropriate cases. It is true that the scourges of communities saturated with drugs must be corrected. It is true that the police alone cannot correct this destructive societal force. But it is also true that we cannot continue to ignore the "root causes" of crime, such as poverty, racism, unemployment, and poor education.
It is, therefore, with concern that the Court broaches a subject which, no matter how just and fair it may be, will be seen by some as "soft on crime." No matter how onerous its penalty, and more importantly, no matter how unjust and unequal the penalties may be for one class of criminals, unthinking citizens, frustrated and afraid, say simply, "Lock 'em all up and melt the keys."
This Court favors an omnibus of remedies which include lengthy incarceration, speedy trials, and appropriately severe sentences to deter crime. Drug trafficking must be reduced and drug treatment for addicts must be made available. The biggest single factor in the elimination of drug usage, violence, and crime is JOBS. But meaningful jobs and opportunities must be available. In plain and simple terms, we must utilize both carrot and stick to eliminate the scourge of crime.
Therefore, let this be perfectly clear. This Court does not condone crime in any form or by any class or group, and is firmly convinced that, in these times especially, punishment must be severe enough and imposed with such certainty and promptness as to deter further transgression. The Court is well aware that there are individuals who must be separated from society for lengthy periods, even life imprisonment, in order to protect society. Sadly, there are youngsters for whom deterrents must be imposed early and sternly enough to change their behavior. Our society must be protected from the random and senseless violence that is so much a part of contemporary America, especially in our inner cities where most of the victims reside.
This Court recognizes that the control of crime is the most important goal of sentencing, and a firm and certain punishment must be the major goal in criminal justice. However, such punishment must be fair; it must fit the particulars of the offense and must acknowledge characteristics of individuals.
Let it be further understood that this Court would play no role in furthering the belief that drugs are to be condoned or ignored. Naturally, the greatest effectiveness would come from controlling those nearest the source of the drugs, but even the couriers and street peddlers facilitate the distribution of the deadly substances and they, too, must be punished  but to a degree commensurate with their culpability.
The "100 to 1" ratio, coupled with mandatory minimum sentencing provided by federal statute, has created a situation that reeks with inhumanity and injustice. The scales of justice have been turned topsy turvy so that those masterminds, the "kingpins" of drug trafficking, escape detection, while those whose role is minimal, even trivial, are hoisted on the spears of an enraged electorate and at the pinnacle of their youth are imprisoned for years while those most responsible for the evil of the day remain free.
*773 Having clearly stated the Court's conviction that crime cannot be reduced without stern and prompt punishment as well as long range plans to reduce criminal activities, the Court now feels emboldened to express a viewpoint designed to eliminate the disproportional punishment for crack, which would enhance the credibility of the government among black citizens and help restore their faith in believing that equal justice is for all.

THE CHALLENGE TO THE COURT
The Court is faced with the task of resolving whether the crack statute violated defendant Clary's equal protection rights. The equal protection component of the Fifth Amendment Due Process clause commands that similarly situated people must be treated alike. The Court's basic understanding of this constitutional rule is that when one group of people violates the same type of laws as other people similar to them, they should be punished in the same manner.
To determine whether a law treats similarly situated people in a dissimilar manner, a violation of equal protection under the U.S. Constitution, the Court must first determine the appropriate type of judicial review to apply. Judicial review is conducted under one of three different levels of scrutiny depending upon the seriousness of the constitutional violation that triggers the review.
The Court conducts the lowest level of constitutional scrutiny, a rational basis review, to determine whether a law that causes disparate treatment among similarly situated persons serves a rational state or governmental purpose. "Equal protection does not require that all persons be dealt with identically ... [but] it does require that a distinction [that is] made have some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966).
The next level of review, intermediate scrutiny, applies when the Court must determine whether the classification scheme included in the law must "fairly be viewed as furthering a substantial interest of the state." Plyler v. Doe, 457 U.S. 202, 217-18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). "Under this standard, although a law does not involve a facially invidious classification, it will be reviewed if it gives rise to recurring constitutional difficulties." Id.
The highest form of constitutional review that the Court evokes, strict scrutiny, is mandated when the legislative classification incorporates presumptively suspect factors, such as race, or fundamental individual liberties, such as religion. In such cases, once the suspect classification is revealed, the government must prove that the classification is narrowly tailored to further a compelling government interest. For example, racist statutes which on their face and in their direct language created segregated facilities such as restrooms and drinking fountains were struck down by the United States Supreme Court under strict scrutiny.
The difficult situation that a Court must face is to determine whether a statute which is facially neutral was enacted for racial reasons and would thereby have a disparate impact on a particular racial group. Whether or not racial discrimination was involved in legislative action that resulted in a law which, although facially neutral, still has a racially disparate impact "demands a sensitive inquiry into such circumstantial evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).
Under Arlington, the Supreme Court set forth key factors to evaluate whether a law was motivated by racial discrimination. These factors included the presence of disparate impact, the overall historical context of the legislation, the legislative history of the challenged law, and departures from the normal legislative process. Additional legal precedent has provided the Court with more criteria for its review, such as foreseeability of the consequences of the legislation; however, Arlington provides the Court with the major benchmark to discover the presence of racial influence in the legislative decision making process.
These various levels of constitutional review evolved as a response to the manner in which racism in America has manifested itself *774 within the legal system. Overt racism, evidenced by such occurrences as "Jim Crow Laws," allowed legislators to enact racist laws without reprisals. As civil rights for all Americans became a reality, continued attempts to maintain racial barriers took on the form of more subtle, covert, facially neutral legislation. Examples of this type of legislation included zoning, voting and housing laws.
Today most legislation would not contain overtly racist referrals and, indeed, would eliminate the slightest allusion to racial factors in the words of the legislation itself. But today, despite the fact that a law may be racially neutral on its face, there still may be factors derived from unconscious racism that affect and infiltrate the legislative result.

A HISTORY OF RACISM IN CRIMINAL PUNISHMENT
That black people have been punished more severely for violating the same law as whites is not a new phenomenon. A dual system of criminal punishment based on racial discrimination can be traced back to the time of slavery.[5] In order to understand the role that racism has played in enacting the penalty enhancement for using crack cocaine, one must first take note of America's history of racially tainted criminal laws, particularly drug laws. Race has often served as a significant contributing factor to the enhancement of penalties for crime.
Early in our nation's history, legislatures were motivated by racial discrimination to differentiate between crimes committed by whites and crimes committed by blacks. For example, "An Act Against Stealing Hogs"[6] provided a penalty of 25 lashes on a bare back or a 10 pound fine for white offenders, while nonwhites (slave and free) would receive 39 lashes, with no chance of paying a fine to avoid the whipping. In 1697, Pennsylvania passed death sentence legislation for black men who raped white women[7] and castrated them for attempted rape. White men who committed the same offense would be fined, whipped, or imprisoned for one year.[8]
During Reconstruction, Southern legislatures sought to maintain control of freed slaves by passing criminal laws directed at blacks that treated petty crimes as serious offenses. A Georgia law passed in 1875 made hog stealing a felony. A Missouri "pig law" defined the theft of property worth more than $10 as grand larceny and provided for punishment of up to five years of hard labor. As a result, Southern prisons swelled and became, for the first time, predominantly black. The prison population in Georgia alone tripled within two years.
Prior to the civil rights era, Congress repeatedly imposed severe criminal sanctions on addictive substances once they became popular with minorities.[9] Historically, a consortium of reactionary media and a subsequently inflamed constituency have combined to influence Congress to impose more severe criminal sanctions for use of narcotics once they became popular with minorities.
*775 Media accounts[10] and inaccurate data influenced public opinion about opium smoking. "Ambivalence and outright hostility" toward Chinese coupled with the concern that opium smoking was spreading to the upper classes,[11] provided the foundation for the passage of the 1909 Smoking Opium Exclusion Act. "Yellow Peril" was a term used in the years between the Great Wars to express the fear that the huge population of the Far East posed a military threat to the West. This fear induced an aversion to the opium usage believed to be prevalent in Chinese communities and foisted anti-opium legislation.
The Harrison Act of 1914, the first federal law to prohibit distribution of cocaine and heroin, was passed on the heels of overblown media accounts depicting heroin-addicted black prostitutes and criminals in the cities.[12] The author of the Act, Representative Francis Harrison, moved to include coca leaves in the bill "since [the leaves] make Coca-Cola and Pepsi-Cola and all those things are sold to Negroes all over the South."[13] At one point the bill appeared to be facing defeat until Dr. Hamilton Wright, the American delegate to the Hague Opium Conference, 1911-1912, submitted an official report in which he warned Congress of the drug crazed blacks in the South whose drug habits "threaten[ed] to creep into the higher social ranks of the country" [emphasis added].[14] The images of narcotics and a black rebellion in the South and images of black addicts involved with white women were central to the hysteria that motivated legislative enactments.[15] His report, amplified and personalized by the news media and photographs, helped to shape public opinion regardless of the factual basis. True or not, the black addict became a stereotype not synonymous with most black men.
The Marijuana Tax Act was signed into law on August 2, 1937, after a successful media campaign orchestrated by Harry J. Anslinger,[16] then the Commissioner of the Treasury Department's Bureau of Narcotics. Using the media as his forum, Anslinger graphically depicted the alleged insane violence which he alleged resulted from marijuana use.[17]
In later decades cocaine became associated with exotic groups such as Hollywood entertainers and jazz musicians. It earned the moniker of the "rich man's drug." In the early 1960s and 1970s, cocaine began to move into mainstream society, and became the "drug of the eighties." Even with the widespread use of powder cocaine, no new drug laws were enacted to further criminalize or penalize cocaine possession. The "war on drugs" with respect to powder cocaine was concentrated on impeding international import of the drug or targeted large scale financiers. The social history is clear that so long as cocaine powder was a popular amusement among young, white professionals, law enforcement policy prohibiting cocaine was weakly enforced.
Almost every major drug has been, at various times in America's history, treated as a threat to the survival of America by some *776 minority segment of society. Panic based on media reports which incited racial fears has been used historically in this country as the catalyst for generating racially biased legislation. The association of illicit drug use with minorities and the threat of it "spreading to the higher ranks" is disturbingly similar to the events which culminated in the "100 to 1" ratio enhancement in the crack statute.[18]

RACISM IN TRANSITION
The mid-1860s marked the eve of the demise of slavery. In both the urban North and South, blacks and whites lived side by side but in segregated arrangements. Free blacks were prohibited from using many public conveniences and conveyances. Blacks were systematically segregated. "Jim Crow" laws, a Northern creation, moved South.
Blacks in the North were made painfully aware of white supremacy and black inferiority. Although blacks had token freedom, white constituencies firmly believed that blacks were intellectually, politically, socially, and physically incapable of assimilating into the white mainstream. Even Abraham Lincoln made a clearly politically expedient statement in 1858 when he said:
"I will say then that I am not, nor ever have been in favor of bringing about in any way the social and political equality of the white and black races [applause]  that I am not nor ever have been in favor of making voters or jurors of negroes, nor of qualifying them to hold office, nor to intermarry with white people, and I will say in addition to this that there is a physical difference between the black and white races which I believe will for ever forbid the two races living together on terms of social and political equality. And inasmuch as they cannot so live, while they do remain together there must be the position of superior and inferior, and I as much as any other man am in favor of having the superior position assigned to the white race." Woodward, C. Vann, The Strange Career of Jim Crow, p. 21.
It would, of course, be unimaginable for a politician today to make such statements. In the context of what was necessary to solicit political support in 1858, utterances like these were comparatively mild. But today or yesterday, Lincoln's speech would, nonetheless, have a harmful impact upon blacks and is a good example of the effect of "unconscious racism" in his day.
In the anarchy that followed the Civil War, whites became hysterical that blacks would seek insurrectional revenge. As freedmen roamed the countryside and congregated in towns, white reactionary frenzy increasingly put pressure on the federal government to respond.[19] In 1865 President Johnson passed the notorious Black Codes, "intended to establish systems of peonage or apprenticeship resembling slavery." Id. at 23. Until the late 1940s, America solidly entrenched institutionally racist laws and forms of behavior into the social fabric of the country.
In 1945, the legal codes of many states openly discriminated against blacks, denying them the freedom to compete for and enjoy the good things of American life. But around 1950, many of these laws began to be struck down by the federal courts in a series of decisions leading up to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Those decisions, however, did not automatically end segregation nor did they move blacks from a position of legal inferiority to one of equality. The legacy of years of slavery and second class citizenship in the wake of emancipation could not be so easily eliminated.
*777 The 1960s were years of great turmoil in America. The assassinations of President John F. Kennedy, Robert Kennedy, and Dr. Martin Luther King left an indelible mark in our nation's history. The civil rights struggle epitomized the inherent principles of American justice and thus provided the moral high ground to those advocating respect for human dignity for all men  black and white alike. It was slowly becoming politically correct and morally right to espouse acceptance of blacks into the American mainstream. Overt discrimination was no longer in vogue and could not be publicly displayed. To accept blacks into hitherto closed areas of society was in style. But for many the years of segregation left their mark  so discrimination, unconscious though it may have been, still lived.
During the 1970s, victories of the civil rights battles had brought new hopes and heightened expectations to many residents of the inner cities. They then saw the opening wedge of success, at least by a few talented individuals who were entering mainstream America and achieving financial, political, and professional success. The dismal days of "American apartheid" or segregation appeared to be over; public accommodations were opening, albeit grudgingly in some instances, and a new day had begun for the forgotten and poor. Retrenchment set in. Challenges to affirmative action programs were being heard everywhere. While employment was available to the educated and trained, there were fewer menial jobs available. The great reduction in pay for jobs in service industries such as restaurants and labor pools in contrast to factories and assembly lines made such employment only suitable for students or retirees.

IMPACT OF THE 80s.
The 1980s were times of cataclysmic economic change in America. The smoke-stack industries which furnished considerable highly paid employment to many persons with limited formal education were dead, dying, or moving elsewhere. The major corporations were retreading and making more products with more machines but fewer humans, and finally, a pervasive opinion grew that government had to curtail spending for the poor in order to reduce its own budget deficit. Even the grants of the "military-industrial" complex were affected. Local and state governments were getting less and less money returned by the federal government, and therefore most community projects such as hospitals, playgrounds, emergency shelters, and food pantries were closed. Unemployment reached levels as high as 8 percent nationally but in the inner cities it hovered around 20 percent and in some cases soared to levels of 50 to 60 percent for young black men.[20]
The 80s found many communities bereft of the assistance from institutions financed by the federal government, and with virtually no employment, many young residents of the inner cities lost hope and motivation. In their anger and frustration they turned to the most visible source of immediate financial reward  drug traffic. Because there were so few employment opportunities otherwise available, and because the immense drug market offered huge profits immediately, many persons were attracted to it. This, in turn, brought competition, and in the absence of regulation (usually enforced by government), turf competition developed which led to more and more gang wars in which the use of military type firearms flourished. Desperate to maintain their share of the obscenely lucrative profits from drug peddling, the gangs became more aggressive and exhibited little sympathy for bystanders caught in the crossfire. It must be noted that in the early years of the drug war few paid attention to the escalating violence among these competing gangs because they were then only killing each other or an occasional hapless victim who lived nearby. The media rarely did more than mention the victims who lived in the inner cities. It was only when suburbanites and European tourists became targets of these desperados that the government responded. Then did much of law enforcement concentrate on "controlling crime," mainly by keeping it boxed up in the ghettos.
Acrimonious relations began to grow in many communities, and a tendency simply to *778 contain the crime in a designated area rather than to try to eliminate it began to form. Highways and fences were used to segregate the troubled zones, and police tried to isolate the residents of inner cities, many times by unjustified harassment and unfair arrests. In a recent 1987 incident, the residents of East St. Louis, Illinois, were blocked from crossing the bridge across the Mississippi River to prevent their attendance at the St. Louis Fourth of July celebration until then Chief U.S. District Judge John F. Nangle, E.D. Missouri, ordered the police department to remove the barriers.
In the mid-1980s a sea change of attitudes toward crime itself had coalesced in America. Prior to this era, the predominant view was that crime was caused by deprivation or neglect and that rehabilitation was the main goal of incarceration. When the media (both press and electronic) became able to reveal instantaneously to the entire world graphic details of any crime occurring anywhere in this nation, the general public became aroused and angered as never before. The repetition of the stories on TV, cable, newspaper, and magazines, fanned the flames of anger into an inferno of fiery frenzy. This anger resulted in town hall meetings, TV crime dramas, pitiful photographs, all generating even more notoriety relating to crime and criminals. Most important of all, those parts of a neighborhood believed to be immune to the spread of crime now found that the plague was spreading, first to the edges of the inner cities and then to the affluent suburbs and even to the distant rural towns and villages.
In assessing judgment and determining fault, all facets of the circumstances must be known and weighed. Picture a city where it is easier to buy cocaine than it is to purchase a loaf of bread.[21] Imagine a town that discourages those who could be role models by denying them mortgages and loans to improve their homes.[22] Think of a community where mothers, barely more than children themselves, serve as one-parent heads of households in a world without fathers.[23] Consider a neighborhood without effective leaders because they all have fled to suburbia. Contemplate the facts that markets and malls are nonexistent; dilapidated buildings serve as hideaways for prostitutes and drug dens; sales bulletins, catalogs, and coupons are never delivered to residents because of their mailing zip codes, thus eliminating opportunities for discounts and lower prices. Remember the children who rarely see a doctor, lawyer, or teacher as a neighbor and whose only source of inspiration is a chain bedecked drug peddler.
These portraits of misery and degradation are the daily world of the inner city resident and are all, part and parcel, products of unconscious racism. Is it any wonder that there is no motivation, no happiness, no hope? It is not strange to recognize that with such misery surrounding them they have lost the ambition to work and to fight, but only await the inevitable  death. The terror of long prison terms has little deterrence for them  their life is already a prison of despair.
It has been only a little over 30 years since the "legislative prohibition of racial discrimination in major domains of national life." McClesky v. Kemp, 481 U.S. 279, 344, 107 S.Ct. 1756, 1794, 95 L.Ed.2d 262 (Brennan, J. dissenting). Although moderate strides have been taken, we cannot fool ourselves into believing that our decisions are free from the influences of this country's legacy of racial subordination and discrimination. If we deny the influences of the vestiges of racism, we will "remain imprisoned by the past." Id.

UNCONSCIOUS RACISM
Thus, the root of racism has been implanted in our collective unconscious and has biased the ideas that Americans accept about *779 the significance of race.[24] Racism goes beyond prejudicial discrimination and bigotry. It arises from outlooks, stereotypes, and fears of which we are vastly unaware. Our historical experience has made racism an integral part of our culture even though society has more recently embraced an ideal that rejects racism as immoral. When an individual experiences conflict between racist ideas and the social ethic that condemns those ideas, the mind excludes his racism from his awareness.[25]
Conjointly, the root of unconscious racism can be found in the latent psyches of white Americans that were inundated for centuries with myths and fallacies of their superiority over the black race. So deeply embedded are these ideas, that their acceptance and socialization from generation to generation have become a mere routine.
Unconscious racism existed in some limited form during slavery. As outright discrimination against blacks became increasingly politically and socially unacceptable, and, in 1954, in some measure illegal, racist actions metamorphized into more subtle forms of discrimination. As more well-educated blacks flowed into America's mainstream, whites even began to differentiate between the kind of blacks who reflected white values and who were not like "those other" blacks akin to the inner city stereotype.
A benign neglect for the harmful impact or fallout upon the black community that might ensue from decisions made by the white community for the "greater good" of society has replaced intentional discrimination. In the "enlightened and politically correct 90s," whites have become indignant at the suggestion that they harbor any ill-will towards blacks or retain any vestiges of racism. After all, they have black friends. They work with black people every day. They enjoy black entertainers on their favorite television programs every night.
Similarly, police and law enforcement authorities responded that they were also protecting black neighborhoods and black citizens from the scourges of crime and drugs by using harsh "get tough" laws to arrest crack dealers and other criminal perpetrators who lurked in the ghetto. Therefore, the logic continued, it really did not matter what happened to those blacks who did not fit the mold as long as white America was kept protected and safe from them. Hardly any law or measure was too harsh to deal with them, including the crack statute.
When counsel first argued that overt racism was really the basis for the discriminatory crack penalties, this Court rejected that approach out-of-hand, for the Court did not believe that such outrageous and outmoded ideas would affect the legislators of this day and age. But upon reflection, the Court recognizes that while intentional discrimination is unlikely today, unconscious feelings of difference and superiority still live on even in well-intentioned minds. There is a realization that most Americans have grown beyond the evils of overt racial malice, but still have not completely shed the deeply rooted cultural bias that differentiates between "them" and "us."
The illustration of unconscious racism is patently evident in the crack cocaine statutes. Had the same type of law been applied to powder cocaine, it would have sentenced droves of young whites to prison for extended terms. Before the enactment of such a law, it would have been much more carefully and deliberately considered. After all, in these days when "toughness on crime" is a political virtue, the simplest and fairest solution *780 would have been to make the severe punishment for powder cocaine the same as for crack cocaine. But when the heavy punishment is inflicted only upon those in the weak and unpopular minority community, it is an example of benign neglect arising from unconscious racism.
Psychoanalytic theory explains the processes which govern the mind and control mental behavior as primary and secondary. The primary process, the Id, consists of wishes, desires and instincts that strive for gratification, and which occur outside of our awareness. The secondary process, the Ego, happens under conscious control and is bound by logic and reason. "The Ego is required to respect the demands of reality and to conform to ethical and moral laws."[26] The thoughts and desires generated by the Id will not reach our conscious control until screened by the Ego where they are "criticized, rejected or modified" by defense measures.[27] In the case of a conflict, the information from the Id will not pass, thereby remaining in the unconscious, or will pass by "disguising forbidden wishes and making them palatable."[28]
Racism is irrational.[29] It is socially and politically unacceptable. Because the "Ego must adapt to cultural order,"[30] ideas, attitudes, and behavior based upon racial prejudice will be repressed and relegated to the unconscious by the Ego and not allowed to pass to the conscious until they reshape or restructure to be disguised as morally and socially acceptable.[31] When an individual cannot live up to the aspirations and standards of his own conscience, he will rationalize his unexplained conflict in his emotions with a legitimate reason. Hence, racism is forced into the unconscious mind.[32] A person who feels benign toward blacks will nevertheless make decisions and take actions that will harm minorities "because of" their race and consequently create racial stereotypes.[33]
Cognitive theorists promote that "categorization" is a common source of racial stereotypes. Because too many events occur daily for the mind to address them on an individual basis, the mind categorizes experiences in order to make sense of them. The more particular the categorization of groups of people, the more likely the person is to sharply distinguish the characteristics of individuals belonging to the group. Social categories are created through assimilation, which "entails learning and internalizing preferences and evaluations."[34] Stereotyping, assimilating and internalizing occur early in life, usually from parents or television. Becoming fearful of blacks, perceiving blacks as dangerous, different or subordinate, are lessons learned and internalized completely *781 outside of our awareness, and are reinforced by the media generated stereotyping.[35]
Studies of the impact of race on white decision making nearly always explain disparate effects by focusing on negative assessments of, or undesirable outcomes for, nonwhites, rather than positive results for whites. That is, they adopt a conceptual framework in which unconscious race discrimination is triggered by stereotyping.[36]
Whites are rarely introduced to the image of blacks as criminals through direct experience; generally, the media serves to provide and promote these racial caricatures. A fearful white class afraid to encounter a black man results from never being exposed to positive images of black America.[37] Given the racially segregated nature of American economic and social life, the media has played an important role in the construction of a national image of black male youth as "the criminal"[38] in two significant respects which served to enhance penalties for crack cocaine violators: 1) generating public panic regarding crack cocaine; and 2) associating black males with crack cocaine. Ergo, the decision maker who is unaware of this selection perception that has produced his stereotype will believe that his actions are not motivated by racial prejudice.[39]
The influence of "unconscious racism" on legislative decisions has never been presented to any court in this context. Constitutional redress to racial discrimination has resulted primarily from judicial vigilance directed toward correcting overt and facially discriminatory legislation forged first by slavery and followed by continuing racial animosity toward blacks and other ethnic minorities. Remaining still is a more pernicious, albeit intangible, form of race discrimination in the individual's unconscious thoughts that influences the decision making process. As a result, "individuals ... ubiquitously attach a significance to race that is irrational and often used outside their awareness." McClesky v. Kemp, 481 U.S. 279, 332, 107 S.Ct. 1756, 1788, 95 L.Ed.2d 262 (1987) (Brennan, J. dissenting) (quoting Lawrence, The Id, The Ego and Equal Protection, infra fn. 20).
Consequently, the focus on "purposeful" discrimination is inadequate as a response to more subtle and deeply buried forms of racism.[40] In 1909, the United States Supreme Court acknowledged that "[racial] [b]ias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence." Crawford v. United States, 212 U.S. 183, 196, 29 S.Ct. 260, 265, 53 L.Ed. 465 (1909). Eighty-three years later, Crawford holds: the inquiry to determine racial bias is still "difficult, if not impossible." Without consideration of the influences of unconscious racism, the standard of review set forth in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) is a "crippling burden of proof." Batson v. Kentucky, 476 *782 U.S. 79, 92, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1985).
The concomitant twin of racism is class oppression. Race and class bias have always worked together to reinforce systems of social control and economic distribution.[41] Arguably, most forms of overt racism have been eliminated. However, those who choose to discriminate on the basis of race find it easier to achieve the same results by basing their distinctions on class. Ergo, identification of race bias has become more complex, more divisive, and morally more problematic.
On average, blacks experience significantly worse economic conditions than whites, and historically the criminal justice system has dealt more harshly with those who are economically weak. Black people constitute a disproportionate share of persons who exist in absolute poverty. In 1990, there were 33.6 million persons in poverty in the U.S. Although blacks comprise only 12% of the nation's population, 29% of those poverty stricken were black  2.4 times the rate of the general population.[42] This mixture of race and economic discrimination has diminished the bright line of overt racism. "The ... distorting effects of racial discrimination and poverty continue to be painfully visible" in decisions to mete out criminal punishment. Godfrey v. Georgia, 446 U.S. 420, 439, 100 S.Ct. 1759, 1770, 64 L.Ed.2d 398 (1980) (Marshall, J. concurring) [footnote omitted].
It is against this background that the Court considers the merits of defendant's challenge.

EQUAL PROTECTION ANALYSIS
A current equal protection analysis must therefore take into account the unconscious predispositions of people, including legislators, who may sincerely believe that they are not making decisions on the basis of race.[43] This predisposition is a pertinent factor in determining the existence of a racially discriminatory motive. Racial influences which unconsciously seeped into the legislative decision making process are no less injurious, reprehensible, or unconstitutional. Although intent per se may not have entered Congress' enactment of the crack statute, its failure to account for a foreseeable disparate impact which would effect black Americans in grossly disproportionate numbers would, nonetheless, violate the spirit and letter of equal protection.
The equal protection component of the Fifth Amendment Due Process clause commands that similarly situated people be treated alike. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). A criminal defendant who alleges an equal protection violation must prove that the "invidious quality" of governmental action claimed to be racially discriminatory "must ultimately be traced to a racially discriminatory purpose." Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).[44] Absent direct evidence of intent to discriminate, the defendant can make a prima facie case "by showing [that] the totality of the relevant facts gives rise to an inference of discriminatory purpose." Id. In deciding whether the defendant has carried the burden of persuasion, a court must undertake a "sensitive inquiry into such circumstantial evidence *783 of intent as may be available." Arlington, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).
In Arlington, the Supreme Court listed circumstantial evidentiary sources for judicial review of legislative or executive motivation to determine whether a racially discriminatory purpose exists. The "subjects of proper inquiry," are:
(1) adverse racial impact of the official action,
(2) historical background of the decisions,
(3) specific sequence of events leading up to the challenged decision,
(4) departures from normal procedure sequence,
(5) substantive departure from routine decisions,
(6) contemporary statements made by the decision makers, Davis, 426 U.S. at 252, 96 S.Ct. at 2053, and
(7) the inevitability or foreseeability of the consequence of the law, Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 266, 99 S.Ct. 2282, 2289, 60 L.Ed.2d 870 (1979).
The Court explicitly stated that the list of evidentiary sources was not exhaustive. Arlington 429 U.S. at 268, 97 S.Ct. at 565. Therefore, this Court will proceed with its examination by reviewing the circumstantial evidence, including the Arlington factors, to determine whether race influenced the legislature's actions.

ENACTMENT OF THE CRACK STATUTE
Crack cocaine eased into the mainstream of the drug culture about 1985 and immediately absorbed the media's attention. Between 1985 and 1986, over 400 reports had been broadcast by the networks.[45] Media accounts of crack-user horror stories appeared daily on every major channel and in every major newspaper.[46] Many of the stories were racist. Despite the statistical data that whites were prevalent among crack users, rare was the interview with a young black person who had avoided drugs and the drug culture, and even rarer was any media association with whites and crack. Images of young black men daily saturated the screens of our televisions. These distorted images branded onto the public mind and the minds of legislators that young black men were solely responsible for the drug crisis in America. The media created a stereotype of a crack dealer as a young black male, unemployed, gang affiliated, gun toting, and a menace to society.[47] These stereotypical descriptions of drug dealers may be accurate, but not all young black men are drug dealers. The broad brush of uninformed public opinion paints them all as the same.
Legislators used these media accounts as informational support for the enactment of the crack statute. The Congressional Record, prior to enactment of the statute, is replete with news articles submitted by members for their colleagues' consideration which labeled crack dealers as black youths and gangs.[48] Members of Congress also introduced into the record media reports containing language that was either overtly or subtly racist,[49] and which exacerbated white *784 fears that the "crack problem" would spill out of the ghettos.[50]
These stereotypical images undoubtedly served as the touchstone that influenced racial perceptions held by legislators and the public as related to the "crack epidemic." The fear of increased crime as a result of crack cocaine fed white society's fear of the black male as a crack user and as a source of social disruption. The prospect of black crack migrating to the white suburbs led the legislators to reflexively punish crack violators more harshly than their white, suburban, powder cocaine dealing counterparts. The ultimate outcome resulted in the legislators drafting the crack statute with its Draconian punishment.
Arlington decided that departures from normal procedures are relevant in determining the existence of invidious influences. Defendant presented evidence that there were significant departures from prior substantive and procedural sequences, which point toward invidious discriminatory purpose.
The media reports associating blacks with the horrors of crack cocaine caused the Congress to react irrationally and arbitrarily. The evolution of the 100 to 1 crack to powder ratio mandatory minimum sentence was a direct result of a "frenzied" Congress that was moved to action based upon an unconscious racial animus. The "frenzied" state of Congress led members to depart from normal and substantive procedures that are routinely considered a part of the legislative process.
The 1986 Controlled Substances Act followed an extraordinarily hasty and truncated legislative process. As Eric Sterling, then counsel to the House Subcommittee on Crime, has summarized:
The Controlled Substances Act sentencing provisions were initiated in the [House] Subcommittee on Crime in early August 1986 in a climate in the Congress that some have characterized as frenzied. Speaker O'Neill returned from Boston after the July 4th district work period where he had been bombarded with constituent horror and outrage about the cocaine overdose death of NCAA basketball star Len Bias after signing with the championship Boston Celtics. The Speaker announced that the House Democrats would develop an omnibus anti-drug bill, easing the reelection concerns of many Democratic members of the House by ostensibly preempting the crime and drug issue from the Republicans who had used it very effectively in the 1984 election season. The Speaker set a deadline for the conclusion of all Committee work on this bill as the start of the August recess  five weeks away.
The development of this omnibus bill was extraordinary. Typically Members introduce bills which are referred to a subcommittee, and hearings are held on the bills. Comment is invited from the Administration, the Judicial Conference, and organizations that have expertise on the issue. A markup is held on a bill, and amendments are offered to it. For this omnibus bill much of this procedure was dispensed with. The careful deliberative practices of the Congress were set aside for the drug bill. [Emphasis added.]
Hearings before the United States Sentencing Commission on Proposed Guideline Amendments for Public Comment (Mar. 22, 1993) (Testimony of Eric E. Sterling, President of the Criminal Justice Policy Foundation), [Def.Ex. 2D.]
Few hearings were held in the House on the enhanced penalties for crack offenders. Despite the lack of fact-gathering about crack, "the 100:1 cocaine to crack ratio ... was originally a 50:1 ratio in the Crime Subcommittee's bill, H.R. 5394, ... arbitrarily doubled simply to symbolize redoubled Congressional seriousness." Id. at 4.
When the Senate considered the legislation, many Senators fruitlessly cautioned against undue haste in light of the House's abbreviated consideration of the bill,[51] to little *785 avail. Tossing caution to the wind, the Senate conducted a single hearing between 9:40 a.m. to 1:15 p.m., including recesses. Attendance was intermittent. "Crack" Cocaine: Hearing Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, 99th Cong.2d Sess. (July 15, 1986) ("Crack Hearing").
The Supreme Court has addressed the issue of foreseeability in the disparate impact context as follows:
[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.... Adherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance ... may be considered by a court in determining whether an inference of [discriminatory] intent should be drawn."
Columbus Bd. of Education v. Penick, 443 U.S. 449, 464-65, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979), [citations omitted]; See Feeney, 442 U.S. at 279, n. 25, 99 S.Ct. at 2296, n. 25.
What cannot be clearly gleaned from the transcripts of floor discussions among congressional members may well be inferred from the exhibits that were introduced into the record. Legions of newspaper and magazine articles regarding the crack cocaine epidemic depicted racial imagery of heavy involvement by blacks in crack cocaine. Practically every newspaper account featured a black male either using crack, selling crack, involved in police contact due to crack, or behind bars because of crack.
Media pictures and stories emphasized that the "crack problem" was a "black problem" that needed to be isolated and prevented from "spreading" to white suburban areas. The intent to contain the crack problem and prevent it from entering the "mainstream" or the "suburbs" is evident from the articles cited in the Congressional Record. To keep crack out of suburbia meant to keep crack users and dealers out of suburban neighborhoods. While it may not have been intentional, it was foreseeable that the harsh penalties imposed upon blacks would be clearly disproportional to the far more lenient sentences given whites for use of the same drug  cocaine.
Circumstantial evidence of invidious intent may include proof of disproportionate impact. Davis, 426 U.S. at 242, 96 S.Ct. at 2048. "Impact of the official action  whether it *786 `bears more heavily on one race than another,'" id., is important evidence.[52]
Defendant's evidence that the impact of the crack statute "bears more heavily" on blacks than whites is undisputed. 98.2 percent of defendants convicted of crack cocaine charges in the Eastern District of Missouri between the years 1988 and 1992 were black.[53] Nationally, 92.6 percent of the defendants convicted during 1992 of federal crack cocaine violations were black and 4.7 percent of the defendants were white.[54] In comparison, 45.2 percent of defendants sentenced for powder cocaine were white, as opposed to 20.7 percent of black defendants. All of the defendants sentenced for simple possession of crack cocaine were black.[55] The national figures comport to essentially the same percentage as the Missouri statistics.
According to a U.S.A. Today report which investigated the racial disparity caused by the "100 to 1 ratio" and the mandatory minimum sentencing practices in the country, although only 12 percent of the population, blacks accounted for 42 percent of all drug arrests in 1991.[56] The 1992 federal figures indicate that blacks comprise 1.6 million of the illegal drug use population while 8.7 million whites admit to illegal drug use.[57] Yet, blacks are four times as likely as whites to be arrested on drug charges in this country. Notably, in the Eastern District blacks are eight times as likely to be arrested.[58]
According to the U.S. Sentencing Commission, blacks receive sentences at or above the mandatory minimum more often than whites arrested on the same charge.[59] The disparate application appears to be related to race,[60] and the disparity is constant even when variables such as nature of the offense and prior criminal record are considered.[61]
Moreover, overcrowding in the Federal Bureau of Prisons reflects the disparity in a dramatic way. An estimated 90 percent increase[62] in the prison population during the last several years is directly related to the mandatory minimum drug sentences and the sentencing guidelines.[63] As of July 1993, 60.4 percent of the inmates in the Bureau of Prisons are there for drug related offenses.[64] "Attorney General Reno told the Judicial *787 Conference this past summer that the federal prisons are filling faster than new prisons can be built, and the Bureau of Prison faces gridlock within three years." U.S. v. Fleming, 8 F.3d. 1264, 1267 (8th Cir.1993) (Heaney, J., dissenting).
Clary argues that the statistical disparity is overwhelming proof of discrimination, and that in cases[65] where statistical evidence of disparity is "stark," statistics alone have been accepted as the sole source of proof of an equal protection violation. Arlington, 429 U.S., at 266, 97 S.Ct. at 563. This Court agrees that the statistical evidence of disparate impact resulting from crack cocaine sentences is compelling. In one of the first in a long line of cases which interpreted the equal protection clause, the Supreme Court ruled that the effect of a law may be so harsh or adverse in its weight against a particular race that an intent to discriminate is not only a permissible inference, but a necessary one. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). This appears to be the effect of the crack statute challenged in this court.
Objective evidence supports the belief that racial animus was a motivating factor in enacting the crack statute. Congress' decision was based, in large part, on the racial imagery generated by the media which connected the "crack problem" with blacks in the inner city. Congress deviated from procedural patterns, departed from a thorough, rational discussion of the "crack issue" and reacted to it in a "frenzy" initiated by the media and emotionally charged constituents. Under Arlington, all of these factors may be considered by the Court to infer intent.

PROSECUTORIAL AND LAW ENFORCEMENT DISCRETION
The crack statute in conjunction with the resultant mandatory minimum sentence, standing alone, may not have spawned the kind and degree of racially disparate impact that warrants judicial review but for the manner of its application by law enforcement agencies. The law enforcement practices,[66] charging policies, and sentencing departure decisions by prosecutors[67] constitute major contributing factors which have escalated the disparate outcome.[68]
Prosecutors do have broad discretion in determining who will be charged with a crime. All that is required for the prosecutor *788 to have probable cause is to believe that the accused committed an offense defined by statute. "The decision whether or not to prosecute, and what charge to file ... generally rests within his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604. While the prosecutor does have broad discretion, it is not unlimited. For example, the prosecutor may not base the decision to prosecute upon impermissible factors such as race, religion, or other arbitrary and unjustified classifications. Id., at 364, 98 S.Ct. at 668.
Prosecutorial discretion as it relates to crack cocaine cases should be exercised in a manner that is responsive to Congress' expressed intent to target "kingpins" and "high level traffickers." It would seem to be economically sensible to devote scarce government resources to reducing the large ingress and wholesale distribution of powder cocaine by major traffickers which would consequently reduce the existence of crack as a derivative product. Without cocaine, there could be no crack.
However, both national and local statistical data do not show that the prosecution is targeting the upper echelons in the drug trade. Few kingpins are prosecuted. Review of the cases that have been prosecuted in this district reflects a clear pattern of disparate impact. Out of 57 convictions in the Eastern District of Missouri, 55 of the defendants were black, one was white, one was Hispanic, and not one kingpin among them.[69] Three of the 56 defendants were jointly charged with having 944 grams, three others had 454 grams between them, and one had 451 grams. The other 50 had a total of less than 2000 grams, averaging less than 40 grams each. Eight defendants had less than 10 grams. Five of them had less than a gram, barely enough to detect or to utilize.[70] The total amount of crack cocaine for 56 of the 57 defendants (the amount for one defendant was not determined) was less than 4,000 grams. Powder cocaine is usually imported into this country by boats, trucks, and planes, and in huge quantities. Kingpin dealers are then able to transport the drug in brick-like packages referred to as "kilos." A kilogram weighs 1,000 grams. Thus, it appears clear that the removal of this small quantity of drugs would hardly reduce the supply of crack cocaine in St. Louis or impede its flow.
The issue of prosecutorial venue is so intertwined with the racial impact flowing from the crack and mandatory minimum statute that it requires careful scrutiny. Generally, federal prosecutions are much more likely to result in conviction, with more severe punishment. In cases where there is joint jurisdiction of similar offenses, careful discernment by conscientious state and federal prosecutors can carefully select among the charges (state and federal) the ones that more nearly result in the most appropriate penalty. There would be inefficiency in double prosecutions, so a choice ought to be made. While various factors would be considered in selecting federal or state actions, certainly a decision based upon race would not be appropriate. And yet  when an examination of the crack cocaine violations in the district court is made, they are nearly all black (55 of 57). Where conviction is a certainty, harsh penalties inevitable, and nearly all defendants are black, suspicion will arise.
The Court notes that a close examination of many of the 57 files involving crack cocaine in this district shows that federal prosecution occurs with both state and federal law officers making the arrests. Generally, those arrested by state officers had very small amounts of crack cocaine. For example, nine of the 57 crack cocaine defendants were assigned to this Court and most of them had only tiny quantities of crack cocaine. All but one was black. All of them, even though arrested by state law officers, were prosecuted in the federal court. Even a disinterested inquirer would wonder why the tremendous expense of federal prosecution and subsequent incarceration should be wasted on relatively minor offenders. The following tables (Def.Ex. 12B) are a descriptive list of the 57 persons prosecuted for crack cocaine violations in the Eastern District of Missouri during 1989-92. Fifty-five *789 defendants were black, one was Hispanic, and one was white. Those defendants in boldface were assigned to this Court for trial. That is why this Court can produce greater detail garnered from its own files. The defendants who were assigned to this Court were all arrested by state officials and then transferred to the federal courts when charged.

 U.S. DISTRICT COURT DATA
 FOR THE EASTERN DISTRICT OF MISSOURI
 CLOSED CASE VIOLATIONS OF 21 U.S.C. SECTIONS
 841, 842, 843 AND 846 REFERENCING COCAINE
 BASE AND AMOUNT OF COCAINE BASE INVOLVED
 1989
 Case File Amount of
 Defendant Number Cocaine Base
 Dobines, Douglas 89-052CR(3) 19.40 grams
 Wright, Earl 89-052CR(3) 19.40 grams
 Johnson, Alvin 89-052CR(3) 19.40 grams
 Benly, Don 89-058CR(2) 21.43 grams
 Griffith, Vanecia 89-164CR(2) 17.00 grams
 Weaver, Carl 89-174CR(6) 3.83 grams
 Howard, James 89-200CR(6) 87.00 grams
 Gordon, Paris 89-248CR(2) Not in file
 Vassol, Erick 89-249CR(1) 944.55 grams
 Handson, Curtis 89-249CR(1) 944.55 grams
 Handson, Bessie 89-249CR(1) 944.55 grams
 Beavers, Juan 89-285CR(6) 192.94 grams
 1990
 Caldwell, A. 90-012CR(6) 227.00 grams (0.5 lbs)
 McDile, A. 90-014CR(3) 234.96 grams
 McDile, T. 90-015CR(2) 397.84 grams
 Sparks, Derrell 90-046CR(4) 54.63 grams
 McGhee, Thomas 90-046Cr(4) 54.63 grams
 Johnson, Robin 90-135CR(1) 5.00 grams[*]
 Watson, Tracy 90-149CR(6) 16.81 grams
 Watson, Joseph 90-149CR(6) 16.81 grams
 Brooks, Juan 90-150CR(4) 11.93 grams
 Henstead, Marcus 90-242CR(6) 18.76 grams
 1991
 Burns, Cornelius 91-002CR(7) 32.66 grams
 Coats, Jacqueline 91-003CR(5) 142.00 grams (5.0 oz.)
 Monroe, Gerald 91-027CR(7) 454.00 grams
 Jefferson, Michael 91-031CR(4) 1.24 grams
 Lockland, Diondre 91-032CR(7) 7 rocks[**]
 Pressley, Arthur 91-060CR(3) 22.45 grams
 Lenoir, Ernest 91-074CR(4) 158.10 grams
 Moore, Weddie Lee 91-075CR(3) 13.14 grams
 Williams, Trent L. 91-077CR(2) 27.85 grams
 Gross, Wayne 91-085CR(3) 3.00 grams
 Watson, William H. 91-097CR(7) 0.05 grams
 Butler, Rhymale S1-91-112CR(2) 454.00 grams
 Johnson, Jeffrey S1-91-112CR(2) 454.00 grams
 Keeper, Eddie 91-114CR(7) 7.65 grams
 Sanford, (Bernard), J. 91-116CR(3) 1.45 grams
 Mitchell, Cephus 91-183CR(3) 21.97 grams

*790
 Case File Amount of
 Defendant Number Cocaine Base
 Netter, Carl 91-190CR(3) 13.09 grams
 Caldwell, Judy 91-191CR(7) 2.94 grams
 Hill, Amber 91-192CR(7) 0.63 grams
 Thomas, Archie Lee 91-194CR(2) 1.25 grams
 Weekly, Zor Anton 91-195CR(4) 0.75 grams
 Williams, Frederick 91-197CR(7) 6.30 grams
 Melton, Demetrius 91-220CR(7) 10.57 grams
 Whitney, Renice 91-227CR(4) 5.00 grams
 Goff, Michael 91-227CR(4) 5.00 grams
 Robinson, Anthony 91-252CR(4) 40.69 grams
 Davis, Anthony 91-264CR(5) 5.72 grams
 Bogan, Mark 91-286CR(6) 115.36 grams
 1992
 Luckett, Annette 92-CR-005 13.90 grams
 Blocker, Shurran 92-CR-006 13.92 grams
 Listin, Johnny 92-CR-014 [***]
 Lowe, Dwayne 92-CR-022 441.00 grams
 Chappel, John 92-CR-091 File w/Ct. of Appeals
 Brown, Byron 92-CR-113 25.00 grams
 McNeal, Osker 92-CR-115 70.00 grams

Perhaps there were other reasons for charging those with "dust amounts," and then, perhaps they were all charged in the federal court because they had crack and were black. The failure by the prosecutors to explain these and other discrepancies adds a telling ingredient to the argument that the crack statute was constitutionally infirm and further exhibited the unconscious racism proffered here, generally, and as applied to this defendant. After all, while the Eastern District of Missouri includes the City of St. Louis with its large black population, it also includes St. Louis County with a white population four or five times larger. Surely if the prosecution were really free of racism, unconscious or not, there would be more than one white defendant convicted for crack violations in the federal courts of the Eastern District of Missouri in three years.
Without explanation, the logical inference to be drawn is that the prosecutors in the federal courts are selectively prosecuting black defendants who were involved with crack, no matter how trivial the amount, and ignoring or diverting whites when they do the same thing.
There may be rational explanations for these disproportionate figures. That is why this Court repeatedly requested the U.S. Attorney's Office to make available its standards or principles for the selection of crack cocaine cases. But the prosecutor refused to divulge this information (an in camera submission would have been sufficient), citing prosecutorial discretion. The Court is not sure that it has the authority to demand such an explanation from the prosecutor. But failure to divulge the standards used during 1989-92 raises an inference that unconscious racism may have influenced the decision to severely punish blacks for violations involving their form of cocaine while hardly touching whites who utilize another form of the same drug  both are forms of cocaine.
The focus on the prosecution of numerous low level crack dealers appears to be part of a national policy, perhaps designed to give *791 the impression of great victories in the War on Drugs. Such a misguided approach to the elimination of drug traffic has resulted in the necessity for expensive prisons, has destroyed the lives of many young first offenders, and most importantly, has not reduced the quantity of drugs saturating the nation. In the St. Louis area there is a greater amount of cocaine available than in 1980 and it is cheaper. Small-time dealers grow like dandelions and are immediately and easily replaced, which further establishes the authority of the drug kingpins and dilutes the police resources available to curtail kingpin drug dealers.
This Court has known and respected the staff of the United States Attorney's Office for many years, and does not believe that overt racism would influence their decisions. The national statistics comport with the data from the Eastern District of Missouri. What is more likely is that the subliminal influence of unconscious racism has permeated federal prosecution throughout the nation. After all, even U.S. prosecutors are not immune from unconscious racism.

LEVEL OF JUDICIAL SCRUTINY
As with all instances of judicial review of federal legislation, the Court should not lightly set aside the considered judgment of a coordinate branch. See, Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 605, 110 S.Ct. 2997, 3030, 111 L.Ed.2d 445 (1990) (O'Connor, J. dissenting). In Arlington, the Supreme Court acknowledged that the legislature was entitled to judicial deference to its constitutionally ordained legislative power from the beginning. But once there is proof that a discriminatory motive is afoot, "judicial deference is no longer justified." 429 U.S. at 265-266, 97 S.Ct. at 563.
A law which burdens blacks disproportionately and whose influence has been traced to racial considerations, even if unconscious, warrants the most rigorous scrutiny. Such a law can survive only if the classification which is suspect is narrowly tailored to further a compelling governmental interest. McDaniel v. Paty, 435 U.S. 618, 628, 98 S.Ct. 1322, 1328, 55 L.Ed.2d 593 (1978). Consistent with the history of criminalizing behavior among minority groups in this country, at the very least, the crack statute in its application has created a "de facto suspect classification" to which strict scrutiny must apply. Under this standard, the crack statute is defective.
The totality of the facts in this case converge to support the conclusion that racial discriminatory influences, at least unconsciously, played an appreciable role in promulgating the enhanced statutory scheme for possession and distribution of crack. Legislators' unconscious racial aversion[71] towards blacks, sparked by unsubstantiated reports of the effects of crack, reactionary media prodding, and an agitated constituency, motivated the legislators to enhance the punishment scheme to produce a dual system of punishment in the application of this statute.
To rebut defendant's claim that racial animus played a role in penalizing crimes involving cocaine base more severely than crimes involving powder cocaine, the Government offered evidence that members of Congress considered crack to be more dangerous because of its potency, its highly addictive nature, its affordability, and increasing prevalence.[72] Ample evidence has been presented to this Court that contradicts many of Congress' claims.
Congress had no hard evidence before it to support the contentions that crack was 100 times more potent or dangerous than powder cocaine. Even Senator Hawkins, among the first of the members of Congress to initiate dialogue about crack cocaine, noted that "the dividing line between crack and powder cocaine is indistinct and arbitrary." Ex. 17, 132 Cong.Rec. S9788 (daily ed. July 29, 1986) (statement of Senator Hawkins). Dr. Robert Byck, Professor of Psychiatry and Pharmacology of the Yale University School of Medicine, testified at the Crack Cocaine Hearing *792 before the Senate Subcommittee on Governmental Affairs and acknowledged that there was no reliable evidence at that time that crack cocaine was more addictive or dangerous than powder cocaine. [Crack Hearing at 21]; [Schwartz Testimony: Transcript, Vol. II at 50:14-51:3.] Today, there is no reliable medical evidence that crack cocaine is more addictive than powder cocaine. [Schwartz Testimony: Transcript, Vol. II at 49:20-50:6.]
Crack's purported greater potency was not supported by the evidence. The testimony of Dr. Byck provided little more than a layman's explanation of methods of ingestion and unsupported conclusions of crack cocaine's "dangerousness." Dr. Charles R. Shuster, Director of the National Institute on Drug Abuse, provided testimony that supported the dangers of cocaine and gave statistical data on cocaine related deaths. He further testified that cocaine related deaths had increased. His reports did not distinguish among smoking cocaine, smoking crack, or freebasing cocaine. He did state, however, that both the ingestion of cocaine in the form of crack or in liquid form intravenously equally provided rapid and euphoric responses for the user. In comparison, Dr. Schwartz testified that there were far more deaths from ingestion of cocaine nasally. [Transcript, Vol. II 55:6.] He also testified that the intravenous route was far more dangerous than any other method of ingestion. [Transcript, Vol. II 62; and see, Def.Ex. 4(M) and 4(N).]
There is no evidence that the use of crack makes the user physiologically or psychologically more prone to violence or other antisocial behavior than does the use of powder cocaine. [Schwartz testimony.] See Substance Abuse: A Comprehensive Textbook, "Cocaine (and Crack): Neurology" (Gold, Miller, Jonas, M.D.s) p. 225 [Def.Exh. 4V.] Moreover, researchers have concluded that the short-term and long-term effects of crack and powder cocaine are identical. See, Peterson, David, Powder, Crack Effects Called Same, Minneapolis Star Tribune, Oct. 18, 1991, at 1B (Remarks of Dr. Dorothy Hatsukami, Professor of Psychiatry at the University of Minnesota), cited in U.S. v. Willis, 967 F.2d 1220, 1226 (8th Cir.1992) (Heaney, J. dissenting).
According to the market approach, crack cocaine can be distributed in small packets at a low unit price. Crack is no cheaper than cocaine powder because cocaine is the essential product of crack. But all forms of cocaine are available today in greater quantity and at lower prices than a few years ago.
Poor and powerless black people are vulnerable to every form of exploitation. Drugs flow in their community because of desperate economic need meeting rare economic opportunity. There is little other enterprise for these people to turn to in pursuit of the American Dream except the narcotics industry, which is a rare "equal opportunity employer" without concern for educational requirements or previous work performance. Unlike their white suburban counterparts, poverty of blacks brings their illegal activity into open areas that is both annoying to the public and easily targeted by police. It is quite easy for police to sweep them off the streets like grains of sand, only to be replaced by tides of unemployed youths. The sensible course is to direct resources to attack the source of crack: powder cocaine.
If the "100 to 1" ratio were reversed to penalize powder cocaine possession of 50 grams with a 10 year mandatory minimum, Congress would be encouraged to respond with more creative and effective ways to wage the drug war. The uproar from their constituencies would be deafening, and politicians would be moved to action much more quickly. As sad as it may sound, and as much as the Court feels discomfort in pointing it out, if young white males were being incarcerated at the same rate as young black males, the statute would have been amended long ago.
The record does not support the fact that Congress had a reasonable basis to make the harsh distinction between penalties for powder and crack cocaine. It is not difficult to understand the pressures upon Congress to react to the abundance of elements regarding the imminent arrival of crack cocaine, and the political expediency of exploiting its presumed dangers. But the frenzied, irrational response to criminalize crack at 100 times *793 greater than powder cocaine, in a manner that would disproportionately affect blacks, is unjustified.
Even were the Congress' interests compelling, the statute was not drafted in narrow terms to accomplish those interests. Why not punish the possession and distribution of powder cocaine with equal severity as crack cocaine? COCAINE IS COCAINE. Neither should be punished less than or more than the other: they are equal in their harm to society and destruction of individual lives and the punishment should be the same for both. To impose a more severe penalty on a derivative source of an illegal narcotic while the principal source of the drug is tolerated is illogical. To the extent that the source dries up, the derivative must necessarily wither upon the vine. If any enhancement would be justified, it would be to penalize cocaine more severely. Hence, the absence of narrow tailoring corroborates the constitutional infirmity of the statute.

THE JUDICIARY
This Court fully realizes the difficulties facing a court when it must modify or vacate a legislative act  especially when the Congress of the United States responds to the demands of its constituency to "do something" about the most pressing problem in America today  crime. This Court is fully aware of the fact that great deference must be given to such legislative expressions and only in the most extreme circumstances may the courts intervene. With full recognition of the limitations of judicial review, this Court, with reluctance, does act. It is the first and only time in more than 20 years of judicial responsibility that this Court has really seriously considered invalidating a federal criminal statute. Only the most extraordinary circumstances compel that action today.
It is always better for the Congress (or any legislative body) to correct its own miscalculations, and usually it does so quickly at the prodding of the public or the judiciary. We, legislators and judges alike, are all subject to the limitations inherent in our humanity and the delicate balance between the three branches of government is fixed in great measure by our Constitution. That marvelous document guides and corrects our official action, even though it is 200-plus years beyond its initial draftsmanship and well into an age never really contemplated by the geniuses who created it. And yet, in spite of the years and the changes, it is still our beacon and our guiding star. Upon its principles rest our freedom and our liberty.
The country has prospered, under God, and now stands 260 million strong. A diverse and dedicated nation whose principles have adapted to the monumental changes throughout the years must again recognize evil in a new and different form from that of yesterday, and resolutely move forward to amend and correct those plans and methods designed to continue to keep America great.
The quick reaction by Congress to the evils of drugs was normal and meritorious. The public faced an evil of monstrous proportions and it wanted a "quick fix." We must, all of us, view the world around us through the spectacles of our own experiences; we see and feel, talk and think through the shades and tints of those eyeglasses made from our own personal experiences. America, sadly, has, in spite of its repeated expressions of egalitarianism, been plagued with racism and ethnicity of all sorts throughout its history. Men and women or color have clearly borne the brunt of discrimination more than any others. The seeds of slavery, the bitter Civil War, and later economic competition, have all heaped their "chastening" rods upon the backs of black men and women (and to a lesser degree still do today). It is perfectly understandable that all Americans, black and white, have been tainted with the brush of racism, leaving an indelible stain upon their minds. This coloration is reflected in their thoughts and deeds even when they are unaware that it is affecting them. It is an example of unconscious racism where men and women of good will who would not intentionally punish someone because of skin color but who, because of years of conditioned stereotyping, use different measurements as cultural yardsticks and inflict great harm on certain classes or groups without understanding why.
The Congress was attempting to find a quick and simple solution to a vexing problem. While there are always short and longterm *794 solutions to every problem, the tendency on the part of any elected official in our democracy is to respond quickly to those constituents with a recognized problem who want a solution NOW. This is especially true when the mother-lode of votes is in the more insulated suburban areas and not in the inner cities.
The anomaly of modern political wisdom today is to recognize that any politician considered to be "soft on crime" will soon wear the wreath of defeat. Therefore, the immediacy of the problem requires expediency. While the fire is burning, no thought is given to the damage caused by high pressure water hoses, nor is there time to build a more resistant house. The Court recognizes all too well the difficulties before Congress, pressured to find a solution to quell the strident voices of citizens confronting crimes so intense in form and frequency, and so they are oblivious to the injustices occurring because of the rush to judgment.
But judges, by their temperament, experience, and exposure, are expected to weigh more carefully both the long and short range effects of policies and laws. More importantly, the shield of the Constitution gives them the insulation to withstand the firestorm of uninformed public opinion on emotional subjects such as crime. The courts have only one yardstick to measure equality  the Constitution.
In the days when segregation was the order of the day and the laws all bore the unmistakable mark of discrimination, evidenced usually in the very titles of those laws, the federal courts became the refuge of hope and encouragement to the minorities who sought their protection. Unpopular though their judgments were, the courts consistently supported fairness and the Constitution, and made justice a reality for those too weak to achieve it themselves.
The Court realizes there are substantial differences between 1960 and 1990. The Court realizes that the Congress, by and large, is not bent upon discrimination and inequality today. But the Court also recognizes that the vestiges of racism so deeply imbedded in the psyche of America cannot be completely eliminated in all of their subtleties at once. Men and women of general good will are still not completely immune to the more covert forms of the disease of racism. We try, but sometimes we all fail to reach our intended goals.
The reason why we cannot wait for the congressional modification and changes that the Court believes will occur in time is that the horror of continuing is so very destructive. There are many prisoners serving 10-year sentences for possessing with intent to distribute 50 grams of crack. They are usually between 18-30 years of age and about 90 percent are black. Their absence in such numbers, if continued, threatens the possibility of the ultimate extinction of the black race in America.
It must be noted that the detection, arrest, prosecution, and conviction of these petty drug peddlers consumes so much of law enforcement's time and so many of the dollars of the criminal justice system that it makes it more difficult, if not impossible, to really stop the cancerous growth of drugs. The huge numbers of young, petty drug dealers serving long mandatory minimum sentences also use precious prison bed space that would better be reserved for the use of violent repeat offenders, the class of persons that society needs to be protected from most of all.
This Court knows that its decision today will be unpopular with many and, indeed, may seem senseless to some. The Court also knows that its opinion may not be politically correct, or in keeping with the majority of opinions currently controlling the law. But just as the laws on civil rights and discrimination took many years to change (more than 50 years elapsed between Plessy v. Ferguson (1897) and Brown v. Board of Education 1954), it may take time for equality under these laws to be fully honored.
The old cliche of fools rushing in where angels fear to tread may be applicable here, but a judge's conscience must always respond to the call of the Constitution. Truth must be recognized and respected though the heavens fall.
Even if appellate review points to a different path, the evaluation and reflection that *795 this perplexing problem has occasioned is of great value. It will not have been in vain. The sequence of events which led to the enactment of the 1984 crack statute can be summarized as follows:
First, the historical precedent of imposing much more severe penalties against blacks than those placed upon whites for the same offense is evident, especially in drug cases. The crack statute of today follows that same pattern.
Second, the media engaged in a frenzy of reporting incidents involving crack cocaine and inner city blacks.[73] Most of it was stereotypical of only a small portion of the black community.
Third, there was a furious and emotional demand for the Congress to do something at once. The greatest clamor came from suburbia (mostly white) with its mother lode of votes, while the proposed laws would affect the inner cities (mostly black) and with fewer votes.
Fourth, the Congress failed to follow its own customary procedural standards. Few hearings were held by the subcommittees, while the testimony adduced from the expert witnesses relied upon anecdotal incidents and was not based upon accepted scientific knowledge.
Fifth, the Senate raised the disproportionate punishment from 50 to 1 up to 100 to 1 for "symbolic" purposes. But, symbolism or not, penal statutes are not mere scribbling on a blackboard. They cannot be erased easily, and particularly in view of the mandatory minimum sentence requirement, cannot be reduced or altered, no matter how unjust.[74] Thousands of young black men, many with no prior criminal record, have their lives destroyed in the flower of their manhood because of these "symbolic" chains.
Sixth, even if the government demonstrates a compelling interest in enacting adverse legislation regarding a suspect class, it must do so by narrow restrictions, not by arbitrary, irrational actions designed to curry political favor. The extremely grotesque prospect of 100 to 1 for crimes involved with different forms of the same drug invites skepticism. If the ratio selected had been 2 to 1, 3 to 1, or 5 or 10 to 1, it might have been a logical demarcation. But the exaggerated effect of a 100 to 1 ratio is illogical and not rational. This is particularly true when the source of the crack cocaine is not punished in the same manner. Such a decision defies a sensible explanation. There does not appear to be any other federal statute that imposes such disparate treatment for involvement with different forms of the same drug.
Seventh, the presumption that during the period 1989-92 the federal prosecutors may have permitted race to be a factor in their decisions to prosecute all blacks involved with crack and not to prosecute whites who were similarly involved is present because of the failure of the U.S. Attorney's Office in the Eastern District of Missouri to explain the principles which were followed to decide who would be prosecuted for crack offenses. While it is concluded that the majority of persons involved with crack in the City of St. Louis may be black, it does not appear reasonable to assume that only one white defendant would be charged with crack violations in all of the rest of the Eastern District of Missouri. St. Louis County has a population more than five times greater than the City and is predominantly white. It does not appear credible to believe that only one white *796 would be arrested for crack violations in three years!!! The Eastern District of Missouri covers St. Louis County, too.
This Court further finds that while overt racism has largely disappeared as a result of the civil rights victories, racism still remains in its more subtle, covert form. This unconscious racism permeates the lives of nearly all Americans and is further embedded in the psyche of executives and legislators alike. Many times their actions reflect racist opinions regarding minorities though they may not be consciously and knowingly aware of their own slant of mind. This is especially true when cultural values are involved. The Koerner Report stated that America was rapidly moving toward two nations: one white and rich, and the other black and poor. This conclusion is even truer today than in 1964. The descriptive litany recited by this Court was designed to show the true and ofttimes unknown characteristics of the black community to the broader community. It is difficult to believe, in view of the sordid conditions that exist there, that the black community is really a part of America.
With the successes of the Civil Rights Era still echoing in our ears, it is obvious that a considerable percentage of blacks have entered into the American mainstream. Many government employees, including teachers, college presidents, and scientists, are people of color. Actresses and athletes abound. There are now generals and executives, judges and poets, even one senator and a governor. But that is the bright part of the story. These successful persons have generally sought refuge in suburbia, leaving behind those who are wrongly classified as undesirable and dangerous misfits who must be abandoned and kept apart from the "real America."
Thus it is easy to see the transition of de jure laws of the past dissolving into the de facto practices of today which portray the poor and undereducated blacks as criminals who must be imprisoned forever. If a white student with 50 grams of cocaine is only sentenced to 21 months of imprisonment, while his black counterpart must serve 10 years for the same amount of crack cocaine, we seem to be hearing a cowardly call to retreat.
It would be far more fair and just, and in keeping with the "get tough" rhetoric of today, to require that both black and white violators serve the same 10 years imprisonment, be it "crack" or powder cocaine. Cocaine is, really, cocaine!! No crack could exist without cocaine powder. Eliminate cocaine and crack disappears!! This would be simple and fair and would eliminate racial injustice. Of paramount value would be the enhanced respect for the judiciary and the nation by bringing about equal justice for all  not merely punishment for "JUST US."

FINDINGS AND CONCLUSIONS
In summary, the Court, after careful consideration, reluctantly concludes that the pertinent sections of 21 U.S.C. § 841 which mandate punishment to be 100 times greater for crack cocaine than for powder cocaine are constitutionally invalid, both generally and as applied in this case. The Court finds that there is no material difference between the chemical properties of crack and powder cocaine, and that they are one and the same drug. The Court further finds that this defendant has been denied equal protection of the laws when the punishment assessed against him is 100 times greater than the punishment assessed for the same violation but involving powder cocaine.
The Court further finds that the "symbolic" action of the Congress in raising the original 50 to 1 ratio to 100 to 1 is yet another indication of its irrational and arbitrary actions, and further evidences the failure of the Congress to narrowly tailor its provisions as required by law in suspect class cases.
The Court further finds that the Congress enacted this law in an arbitrary and irrational manner, without the testimony of adequate scientific and professional advice, and without providing sufficient time for subcommittee hearings and debate.
The Court further finds that the statistics offered by the defendant, both local and national, show that the disparate impact upon blacks is so great as to shock the conscience of the court. Ratios as high as 55 to 1 *797 appear in the Eastern District of Missouri; even greater disparities are evident on the national level. These ratios are apparent in arrest levels, convictions, and the prosecutorial acts which mitigate or eliminate punishment for whites while maximizing punishment for blacks. The Court finds that the actions of Congress and the prosecuting officials were influenced and motivated by unconscious racism, causing great harm and injury to black defendants because of their race inasmuch as whites are rarely arrested, prosecuted, or convicted for crack cocaine offenses.
The Court further finds that the Office of the U.S. Attorney for the Eastern District of Missouri only convicted one white person for crack cocaine violations during the years 1989-92 while convicting 55 blacks and one Hispanic. In the absence of explanation by the prosecutors, these disproportionate figures give rise to a strong inference that only blacks are being prosecuted in the federal courts for crack cocaine violations. Prosecution based on race is obviously discriminatory even if it is occasioned by unconscious racism.[75]

INVALIDATION OF THE CRACK STATUTE
Therefore, this Court concludes that the disproportionate penalties for crack cocaine as specified in all of the pertinent sections of 21 U.S.C. § 841 violate the Equal Protection Clause of the U.S. Constitution generally and as applied in this case. The Court further holds that the prosecutorial selection of cases on the basis of race is constitutionally impermissible as applied to this defendant in this case.
Accordingly, the Court has sentenced the defendant to a prison term in conformity with this memorandum.
Dated this 11th day of February, 1994.

ADDENDUM TO MEMORANDUM RE: IMPOSITION OF SENTENCE
Defendant Edward Clary pleaded guilty to a charge of possessing with intent to distribute 67.76 grams of crack cocaine. He was sentenced to a four year prison term on January 26, 1994, prior to the processing of a lengthy legal memorandum which was filed on February 11, 1994.
The statute requiring a mandatory minimum sentence of 10 years for possessing with intent to distribute 50 grams of crack cocaine was coupled with a Sentencing Guideline Table fixing the range of punishment at 121 to 151 months. Had the cocaine been in powder form instead of crack or cocaine base, the Guidelines provided a punishment range of 21-27 months and even included the possibility of probation.
This defendant was 18 years of age at the time of the offense. He had no prior criminal convictions and therefore had a criminal history category of I per the Sentencing Guidelines.
Inasmuch as the Court has invalidated those pertinent sections of the statute fixing the punishment for crack cocaine offenses at a 100:1 ratio compared to powder cocaine, the 10 year mandatory minimum sentence was not applicable. The Court then decided to impose sentence in accordance with the range of the Sentencing Guidelines for powder cocaine, which would be for 21-27 months, with the possibility of probation.
However, the Court believed that there were aggravating circumstances which ought to be considered. Among those circumstances must be included the travel to California to purchase the cocaine and to return with it to St. Louis where he intended to sell it for profit. Because of this forethought and planning the Court departed upwards from the Sentencing Guidelines and imposed a prison sentence of four years followed by three years of supervised release.
NOTES
[*] The enhanced penalty provisions of 21 U.S.C. § 841(b)(1)(A)(iii) provide that any person convicted of possession with intent to distribute "50 grams or more of a mixture or substance ... which contains cocaine base [crack]" shall be sentenced to no less than 10 years in prison. In contrast, the same penalty is imposed on a defendant only if he possesses with intent to distribute 5,000 grams of cocaine [powder] in violation of 21 U.S.C. § 841(b)(1)(A)(ii)(II).
[**] Clary challenged the propriety of the U.S. Sentencing Guidelines on the same legal grounds. U.S.S.G. §§ 2D1.1(a)(3) and (c)(13) of the Drug Quantities and Drug Equivalency Tables equate one gram of cocaine base with 100 grams of powder cocaine. The U.S. Sentencing Commission implemented a congressional directive when it essentially applied the 100 to 1 ratio to its delineation of sentencing ranges. Since the 100:1 ratio is directly derived from § 841(b) (1982 & Supp.V.1987), the separate motions to challenge the Guideline disparity and the mandatory minimum disparity will be treated as one and the same.
[***] See, e.g., U.S. v. Williams, 982 F.2d 1209 (8th Cir. 1992) (upholding the validity of 100:1 ratio, citing its rationale in U.S. v. House (infra.)); U.S. v. Simmons, 964 F.2d 763 (8th Cir.1992) (rejecting equal protection challenge, due process challenge and eighth amendment challenge to 100:1 ratio); U.S. v. Lattimore, 974 F.2d 971 (8th Cir. 1992) (rejecting due process challenge and an equal protection challenge on the ground of disparate impact due to the absence of evidence that Congress had a racially discriminatory motive); U.S. v. House, 939 F.2d 659, 664 (8th Cir.1991) (100:1 ratio does not constitute disproportionate sentencing in violation of the eighth amendment, nor does it violate the equal protection clause); U.S. v. Willis, 967 F.2d 1220 (8th Cir. 1992) (declining to reconsider House in light of State v. Russell); U.S. v. Winfrey, 900 F.2d 1225, 1227 (8th Cir.1990) (rejecting substantive due process and equal protection challenges); U.S. v. Reed, 897 F.2d 351, 353 (8th Cir.1990) (upholding the constitutional validity of 100:1 ratio against a due process challenge); U.S. v. Buckner, 894 F.2d 975, 980 (8th Cir.1989) (crack penalties are rationally related to the legitimate Congressional objective of protecting the public against the highly potent and addictive nature of crack). But see U.S. v. Willis, (Heaney, J. concurring) (concerned about the sufficiency of the record supporting view that Congress had sound basis to make harsh distinction between powder cocaine and crack cocaine, particularly in light of the evidence of racial disparity in drug enforcement [emphasis added]). But see U.S. v. Majied, 1993 WL 315987 (D.Neb.) (downward departure from Sentencing Guidelines due to racially disparate impact on African Americans); State v. Russell, 477 N.W.2d 886 (1991) (Minnesota mandatory minimum statute declared unconstitutional following an equal protection challenge based on disparate impact).
[*] The enhanced penalty provisions of 21 U.S.C. § 841(b)(1)(A)(iii) provide that any person convicted of possession with intent to distribute "50 grams or more of a mixture or substance ... which contains cocaine base [crack]" shall be sentenced to no less than 10 years in prison. In contrast, the same penalty is imposed on a defendant only if he possesses with intent to distribute 5,000 grams of cocaine [powder] in violation of 21 U.S.C. § 841(b)(1)(A)(ii)(II).
[**] Clary challenged the propriety of the U.S. Sentencing Guidelines on the same legal grounds. U.S.S.G. §§ 2D1.1(a)(3) and (c)(13) of the Drug Quantities and Drug Equivalency Tables equate one gram of cocaine base with 100 grams of powder cocaine. The U.S. Sentencing Commission implemented a congressional directive when it essentially applied the 100 to 1 ratio to its delineation of sentencing ranges. Since the 100:1 ratio is directly derived from § 841(b) (1982 & Supp.V.1987), the separate motions to challenge the Guideline disparity and the mandatory minimum disparity will be treated as one and the same.
[***] See, e.g., U.S. v. Williams, 982 F.2d 1209 (8th Cir. 1992) (upholding the validity of 100:1 ratio, citing its rationale in U.S. v. House (infra.)); U.S. v. Simmons, 964 F.2d 763 (8th Cir.1992) (rejecting equal protection challenge, due process challenge and eighth amendment challenge to 100:1 ratio); U.S. v. Lattimore, 974 F.2d 971 (8th Cir. 1992) (rejecting due process challenge and an equal protection challenge on the ground of disparate impact due to the absence of evidence that Congress had a racially discriminatory motive); U.S. v. House, 939 F.2d 659, 664 (8th Cir.1991) (100:1 ratio does not constitute disproportionate sentencing in violation of the eighth amendment, nor does it violate the equal protection clause); U.S. v. Willis, 967 F.2d 1220 (8th Cir. 1992) (declining to reconsider House in light of State v. Russell); U.S. v. Winfrey, 900 F.2d 1225, 1227 (8th Cir.1990) (rejecting substantive due process and equal protection challenges); U.S. v. Reed, 897 F.2d 351, 353 (8th Cir.1990) (upholding the constitutional validity of 100:1 ratio against a due process challenge); U.S. v. Buckner, 894 F.2d 975, 980 (8th Cir.1989) (crack penalties are rationally related to the legitimate Congressional objective of protecting the public against the highly potent and addictive nature of crack). But see U.S. v. Willis, (Heaney, J. concurring) (concerned about the sufficiency of the record supporting view that Congress had sound basis to make harsh distinction between powder cocaine and crack cocaine, particularly in light of the evidence of racial disparity in drug enforcement [emphasis added]). But see U.S. v. Majied, 1993 WL 315987 (D.Neb.) (downward departure from Sentencing Guidelines due to racially disparate impact on African Americans); State v. Russell, 477 N.W.2d 886 (1991) (Minnesota mandatory minimum statute declared unconstitutional following an equal protection challenge based on disparate impact).
[4] Broder, David, Tough on Crime: A Federal Illusion, St. Louis Post-Dispatch, (1/31/94) 7B.
[5] "Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime." Regents of Univ. of California v. Bakke, 438 U.S. 265, 387, 98 S.Ct. 2733, 2798, 57 L.Ed.2d 750 (1978) (Marshall, J., dissenting).
[6] Act of Oct. 1705, in 3 William W. Henning, Statutes at Large; Being a Collection of All the Laws of Virginia (Richmond, Samuel Pleasants 1809).
[7] Death as punishment was also reserved for slaves who were convicted three times for striking a white person, or who wounded or bruised a white person in a "grievous" manner, or who attempted to run away. Conversely, a white person who willfully took the life of a slave two times was then punished by having to pay restitution to the slave owner. Higginbotham, A. Leon, In the Matter of Color: Race in the American Legal Process, (1978) p. 253-254.
[8] Finkelman, P, The Crime of Color, 67 Tulane Law Review 2063, 2101 Fn. 187, citing, The Law About Trying and Punishing Negroes, in 1 Statutes at Large of Pennsylvania in the Time of William Penn (Gail McKnight Beckman ed., 1887).
[9] Testimony by Dr. David Courtwright. Def.Ex. 3(b)-3(g).
[10] For example, See, San Francisco Post, "[t]he chinaman has impoverished our country, degraded our free labor, and hoodlumized our children. He is now destroying our young men with opium." (March 1, 1879).
[11] Musto, D. The American Disease, p. 65, Def. Ex. 3G.
[12] See Musto, David, America's First Cocaine Epidemic, The Wilson Quarterly, Summer 1989.
[13] Musto, D., The American Disease, p. 46.
[14] Heller, J. Drugs and Minority Oppression, (1975); Wrights's claims were accepted as fact. His statements were circulated in the press, in medical records, and in congressional reports. See Def.Ex. 3D: Courtwright, D., A Center of American Policy, Treating Drug Problems, Volume 2 (1992).
[15] Id.
[16] See generally, Inciardi, J., The War on Drugs II, (1992) p. 20-24 (The War).
[17] "An entire family was murdered by a youthful addict in Florida ... [t]hey found the youth staggering about in a human slaughterhouse. With an ax he had killed his father, mother, two brothers, and a sister. He seemed to be in a daze.... He had no recollection of having committed the crime. The boy said that he had [been] ... smoking ... marijuana." American Magazine. quoted in The War, citing Soloman, Larry, Reefer Madness: A History of Marijuana in America, (Indianapolis: Bobbs-Merrill 1979) p. 34.
[18] All of these drug laws had one common theme: the contamination of the white population (or upper class), particularly white women, by minority drug abusers was imminent; therefore, immediate law enforcement and legislation criminalizing the use of narcotics was necessary.
[19] "The Southern states took the first step to reenslave the Negroes. Immediately following the end of the Civil War, many of the provisional legislatures passed Black Codes, similar to the Slave Codes, which, among other things, limited the rights of Negroes to own or rent property and permitted imprisonment for breach of employment contracts. Over the next several decades, the South managed to disenfranchise the Negroes in spite of the Fifteenth Amendment by various techniques, including poll taxes, deliberately complicated balloting processes, property and literacy qualifications, and finally the white primary." Regents v. Bakke, 438 U.S. at 390, 98 S.Ct. at 2799 (Marshall, J. dissenting).
[20] Deft.Ex. 12E, The State of Black America 1993, National Urban League, Inc., publ.
[21] See Todd, C., North St. Louis Hungry for Supermarket Chains, (National Food Store is the only grocery chain in black St. Louis), St. Louis Post-Dispatch, Dec. 5, 1993, p. 1. See also Todd, C. Northside Center Planned (Schnucks Market & Venture to be built in black community), St. Louis Post-Dispatch, Feb. 1, 1994, p. 1.
[22] See Editorial: "Erase the Red Line Around St. Louis," St. Louis Post-Dispatch, Jan. 24, 1994, 6B.
[23] See NEWSWEEK: "A World Without Fathers," August 30, 1993.
[24] "It is unnecessary in 20th-century America to have individual Negroes demonstrate that they have been victims of racial discrimination; the racism of our society has been so pervasive that none, regardless of wealth or position, has managed to escape its impact. The experience of Negroes in America has been different in kind, not just degree, from that of other ethnic groups. It is not merely the history of slavery alone but also that a whole people were marked as inferior by law. And that mark has endured. The dream of America as the great melting pot has not been realized for the Negro; because of his skin color he never even made it into the pot." Regents v. Bakke, 438 U.S. at 400-01, 98 S.Ct. at 2804, (Marshall, J. dissent).
[25] Lawrence, C.III, The Id, The Ego, and Equal Protection: Reckoning with Unconscious Racism, 39 Stanford L.Rev. 317, 323 (1987) Def.Ex. 12(H).
[26] Id. at 331.
[27] "Defense mechanisms such as repression, denial, introjection, projection, reaction formation, sublimation, and reversal." Id. at 331.
[28] Id. at 332.
[29] "This means when people are asked to explain the basis of their racial animosity they either express an instinctive, unexplained distaste at the thought of association with [blacks] as equals or they cite reasons that are not based on established fact and are often contradicted by personal experience." Id. at 332.
[30] Id. at 335.
[31] Id. at 335.
[32] Kovel refers to the resulting personality as the "aversive racist." "The self of the aversive racist is realized as a more socially coherent system within bourgeois culture, and such articulation may result in exceedingly principled activity. The aversive racist may behave in the most apparently constructive way, even to the extent of giving money and support to the cause of bettering [sic] the lives of Negroes, yet retain the characteristic aversion.... As a consequence, the active entertainment of race fantasies is suppressed. The fantasies become weaker, neutral; they are sublimated. The sublimation takes the form of a general rationalization of the personality, a diffuse coolness in sensibility and functioning. The aversion toward black people becomes but an aspect of the general personality change." Lawrence, C. The Id, the Ego, and Equal Protection, at p. 336 n. 75 citing Kovel, J., White Racism: A Psychohistory, (1970).
[33] Lawrence, C. The Id, the Ego and Equal Protection, at 71.
[34] Id. at 337.
[35] See generally, Armstrong, G., TV Entertainment, News and Racial Perceptions of College Students, [Def.Ex. 11F].
[36] See, Flagg, B., "Was Blind, But Now I See": White Race Consciousness and the Requirement of Discriminatory Intent, 91 Mich.L.Rev. 953, 984 (1993).
[37] See, Thomas, C, Media Overlooking Black-Success Stories, St. Louis Post Dispatch, August 31, 1993, 7B. "If you are white, what image comes to mind when you think about young black males? For many it is that of a criminal. When some whites see a young black male on the street, they react by clutching their purses, increasing their walking speed, or telegraphing their discomfort in other ways. Each night in most major cities, local TV news flashes pictures of young black males who have committed criminal acts.... Handcuffed with head down, or shot dead in the gutter or in body bags, this negative image of young black America is tragically a part of the nation's consciousness." [Emphasis added]
[38] Studies have shown that among whites, "[c]oncern about the crime issue is not related to personal risk assessment," but rather a general image of blacks as dangerous criminals. Pamela Jackson, Minority Group Threat, Crime, and Policing 5 (1989).
[39] Lawrence, C., The Id, the Ego and Equal Protection, p. 339.
[40] Blacks are the unfortunate heirs of a legacy of exploitation and domination, a history upon which most prefer not to dwell. However, this is a necessary painful process of increasing white awareness so as to allow them to question and prod themselves for the true reasons for their decisions when they have the potential of effecting primarily minorities.
[41] "Class racism"  Etienne Balibar, "Class Racism" in Race, Nation, Class 204 (Balibar and Immanuel Walerstein, eds. and Chris Turner trans., 1991).
[42] The National Urban League Research Dept. Fact Sheet, April 1992 (citations omitted).
[43] "Improper motives are easy to hide. And because behavior results from the interaction of a multitude of motives, governmental officials will always be able to argue that racially neutral considerations prompted their actions. Moreover, where several decisionmakers are involved, proof of racially discriminatory motivation is even more difficult." Id. at 319.

"Moreover, unconscious prejudice presents an additional problem in that it is not subject to self-correction within the political process ... when the discriminator is not aware of his prejudice and is convinced that he already walks in the path of righteousness, neither reason nor moral persuasion is likely to succeed. The process defect is all the more intractable, and judicial scrutiny becomes imperative." Id. at 349.
[44] The plaintiffs in Davis challenged a Washington, D.C., police testing program because it failed more blacks than whites. Plaintiffs relied solely on disparate impact for their equal protection challenge. The Court held that discriminatory intent was a prerequisite to a finding of a violation of the equal protection clause even in light of disparate impact.
[45] See, Def.Ex. 5(a)-(c); Also see, Inciardi, J., The War on Drugs II, supra at Fn. 13.
[46] The summer of 1986 became known as "cocaine summer" among journalists. See Merriam, John, National Media Coverage of Drug Issues, 1983-1987, printed in "Communication Campaigns About Drugs," Pamela Shoemaker, Ed.
[47] See, Powell and Hershenov, Hostage to the Drug War: The National Purse, the Constitution and the Black Community, 24 U.C.Davis L.Rev. 557, 599-616 (1991).
[48] 132 Cong.Rec. S2495 (daily ed. Mar. 12, 1986) ("big city ghettos" are "infested with crack houses" and "are centers of the new cocaine trade" in crack); 132 Cong.Rec. S4670 (daily ed. April 22, 1986) ("Most of the dealers, as with past drug trends, are black or Hispanic ... whites rarely sell the cocaine rocks."); 132 Cong.Rec. S7123-25 (daily ed. June 9, 1986) (dealers "organize small cells of pushers, couriers and lookouts from the ghetto's legion of unemployed teenagers").
[49] See e.g., 132 Cong.Rec. S4672 (daily ed. April 22, 1986) ("For the growing numbers of the white middle class who have become hooked on cocaine rock, buying the drug can be like stepping into a foreign culture.")
[50] See e.g., 132 Cong.Rec. S7123-25 (daily ed. June 9, 1986) ("There are ominous signs that crack and rock dealers are expanding well beyond the inner city.").
[51] See e.g., 132 Cong.Rec. S13748 (Remarks of Sen. Evans) (referring to "the sanctimonious election stampede of the House of Representatives, a stampede that trampled the Constitution. In fact, at times the action over there resembled a Congressional lynch mob more than it did careful legislation."); id. at S13769 (daily ed. Sept. 26, 1986). (Remarks of Sen. Mathias) ("Members ... should be commended for their efforts to confront this very serious problem and to move it into the direction of some successful solution. It is sometimes, however, that in our haste to do something about a serious problem, we create a whole new array of problems. And I fear that in our haste to do something about drugs before the end of this session of Congress ... we are `flattering the passions.' Because when we flatter the passions, we are all in danger of forgetting fundamental principles. The threat is ... precipitous use of legislative power that poses the greatest threat to our individual liberties and social institutions. Very candidly, none of us has had an opportunity to study this enormous package. It did not emerge from the crucible of the committee process tempered by the heat of debate. The committees are important because, like them or not, they do provide a means by which legislation can be carefully considered, can be put through a filter, can be exposed to public view and public discussion by calling witnesses before the committee. That has not been the origin of this bill. Many of the provisions of the bill never have been subjected to committee review." "If we are contemplating changes to individual freedoms, if we are about to alter major social commitments, then those modifications simply must be discussed fully ... the consequences must be anticipated.") Id. at S13969 (daily ed. Sept. 27, 1986). (Remarks of Sen. Chafee) ("In the rush to be recorded on the right side of the drug issue some Members of Congress have taken extraordinary steps.")

Bingaman: "Despite the necessity of this legislation, our haste to enact a drug bill before we adjourn this Congress raises some questions and some potential concerns. Are we acting to insure short term political gain from a sudden and popularly recognized problem? Or are we making a commitment to address a serious social malaise.... Once the media attention fades will congressional commitment wane proportionality? The fight against drugs will be long...." Quayle: "I have reservations about aspects of this proposal and the rapid processes used to develop it."
[52] The Court in Arlington stated that, "a consistent pattern of official racial discrimination [is not] a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions." 429 U.S. at 266, n. 14, 97 S.Ct. at 564, n. 14.
[53] Def.Ex. 10(a). The figures show that out of the 57 convictions for crack cocaine during 1988 and 1990, 56 were received by blacks and the last defendant was listed as white/hispanic.
[54] Def.Ex. 1(1). See, 1992 U.S. Sentencing Commission representative sample of all drug cases received for the fiscal year 1992. Also See, U.S. Sentencing Commission, Monitoring Data files (April 1-July 31, 1992).
[55] Id.
[56] Def.Ex. 12(k). This figure shows an increase from 1984-30% and 1988-40%.
[57] Def.Ex. 12(k) and (j).
[58] Def.Ex. 12(k); Maddis, "Disparities Suggest the Answer is Yes" (The Drug War is Racist) USA Today, July 23, 1993, cover story, p. 1.
[59] See, Special Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, United States Sentencing Commission, (Aug. 1991) p. 76.
[60] Id. at p. ii, "The disparate application of mandatory minimum sentences in which available data strongly suggest that a mandatory minimum is applicable appears to be related to the race of the defendant, where whites are more likely than non-whites to be sentenced below the applicable mandatory minimum." "This differential application on the basis of race ... reflects the very kind of disparity and discrimination the Sentencing Reform Act, through a system of guidelines, was designed to reduce."
[61] Id. at 82.
[62] The increase in percentages of the prison population incarcerated for drug offenses: 1970-16.3%; 1980-24.9%; 1985-34.3%; 1990-52.3%; 1992-60.4%.
[63] See, Bureau of Prisons, State of the Bureau 1991, (Summer 1992). One of the stated intents of the Comprehensive Crime Control Act of 1984 was to reduce prison overcrowding and encourage the use of more sentencing alternatives, but instead it was amended by the Anti-Drug Abuse Act of 1986 which included the mandatory minimum structure.
[64] Statistics from the Federal Bureau of Prisons.
[65] Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), are examples of cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation. In Gomillion, a state legislature violated the Fifteenth Amendment by altering the boundaries of a particular city "from a square to an uncouth twenty-eight sided figure." 364 U.S. at 340, 81 S.Ct. at 126. The alterations excluded 395 of 400 black voters without excluding a single white voter. In Yick Wo, an ordinance prohibited operation of 310 laundries that were housed in wooden buildings, but allowed such laundries to resume operations if the operator secured a permit from the government. When laundry operators applied for permits to resume operation, all but one of the over 200 Chinese applicants were unsuccessful. In those cases, the Court found the statistical disparities "to warrant and require," Yick Wo, 118 U.S. at 373, 6 S.Ct. at 1073, a "conclusion [that was] irresistible, tantamount for all practical purposes to a mathematical demonstration," Gomillion 364 U.S. at 341, 81 S.Ct. at 127.
[66] Def.Ex. 12K, Is the Drug War Racist?, ("The war on drugs ... is being fought against blacks.... Blacks are four times as likely to be arrested on drug charges  even though the two groups use drugs at almost the same rate.") USA Today, July 23, 1993 at 1A.
[67] In its Special Report to Congress, supra at n. 48, the Sentencing Commission found racial disparities in prosecutors' requests for downward departure: "Downward departures are most frequently granted to whites and least frequently to [blacks] and hispanics. This is most evident at the 120 monthly level, at which whites received substantial assistance departures in 25% of their cases. p. 82.
[68] Despite the conviction rates, authoritative studies show that blacks and other racial minorities are less involved in crack use than whites. According to the National Institute on Drug Abuse, over 2.4 million whites have used crack, as opposed to 990,000 blacks and 348,000 Hispanics. National Institute on Drug Abuse ("NIDA"), National Household Survey on Drug Abuse (Nov. 20, 1992) at 38-39. In other words, the NIDA statistics show that of all individuals who have ever used crack in the United States, 64.4% are white, 26.2% are black, and 9.2% are Hispanic. In the past year before the survey, 540,000 whites used crack, as opposed to 334,000 blacks and 105,000 Hispanics. Id. at 38-39.
[69] A kingpin is defined by weight of narcotics or as a manager or lead operator.
[70] Def.Ex. 12B, Court Data, E.D. of Missouri, Crack cocaine violations 1989-92.
[] Aversive racist is not hostile toward blacks, but prefers to maintain a comfortable social distance. See, Kovel, J., White Racism: A Psycho-history, (1970) Also see, Lawrence, The Id, at 35: The aversive racist will lapse into demonstrative racism when threatened  as when blacks "get too close."
[] See, Crack Cocaine Hearing.
[] It would not be fair to blame the media for sensationalism in publicizing crack cocaine without also crediting those many segments of the profession who presented a more thoughtful, evenhanded evaluation. Space and time do not permit the naming of even a tiny portion of those who took this more constructive approach, but they include Ted Koppel's Nightline, Connie Chung's 48 Hours, as well as the New York Times, USA Today, Christian Science Monitor, St. Louis Post-Dispatch, St. Louis American, and the Chicago Tribune. Many columnists also questioned the wisdom of our present criminal drug laws, including Anthony Lewis, Clarence Page, William Raspberry, Mike Williams, Edwin Yoder, and Cynthia Todd. Space and time prevent the listing of many, many others who have presented the problem in proper and fair perspective, for which we are eternally grateful.
[71] There is a clear consensus of the federal judiciary and the U.S. Sentencing Commission that mandatory sentences are inconsistent with rational sentencing policy.
[72] The Supreme Court has recognized the validity of unconscious racism in a number of judicial opinions. See e.g., Georgia v. McCollum, ___ U.S. ___, ___, 112 S.Ct. 2348, 2364, 120 L.Ed.2d 33 (1992); McClesky v. Kemp, 481 U.S. at 332, 107 S.Ct. at 1788; Batson v. Kentucky, 476 U.S. at 105, 106 S.Ct. at 1727.